PEOPLE OF PORTO RICO, Plaintiff and Appellee, v. CONFESOR MÉNDEZ, Defendant and Appellant.

No. 2950.    Argued June 12, 1928.—Decided May 28, 1929.

*Luis Muñoz Morales* for the appellant. *José E. Figueras* for the appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

Confesor Méndez was charged in the Municipal Court of San Juan with aggravated assault, committed as follows:

"That at 1.35 a. m. on November 4, 1925, on Ponce de León avenue at Stop 16½, Santurce, in the municipal judicial district of San Juan, . . . . in the hall of the Hijos del Oeste Club, wilfully and maliciously, with the criminal intention of inflicting grave bodily injury on the person of José Lago, assaulted him with a Colts revolver, calibre 32, No. 67940, by firing two shots at him without succeeding in wounding him."

A judgment of conviction was rendered by the municipal court against Méndez and he appealed to the district court. After a trial *de novo* the district court also convicted Méndez and sentenced him to three months in jail with costs. Thereupon he appealed to this court and assigns in his brief the commission of three errors, as follows:

"1. The complaint in this case does not charge a crime of aggravated assault and battery.

"2. The court erred in admitting the testimony of witness Aureliano Martínez in order to impeach the credibility of a witness (José Lago) over the objection and exception of the appellant.

"3. The judgment appealed from is contrary to the law and the evidence."

In arguing the first assignment the appellant contends that the complaint does not charge a crime of "aggravated

assault and battery'' because it admits that there was no battery when it states that the defendant *did not succeed in wounding* the person at whom he fired.

That is true, but it results also from the express wording of the complaint that it did not charge ''aggravated assault and battery,'' but ''aggravated assault,'' and that this offense exists was decided clearly in 1927 when the question was submitted to this court in *Lange* v. *People,* 24 P.R.R. 796.

The jurisprudence was established as follows:

''Sections 1 to 8 inclusive of the Act to define and punish simple assault, simple assault and battery, aggravated assault and aggravated assault and battery, and to repeal section 237 of the Penal Code, approved March 10, 1904, are literal copies, with the exception of a few insignificant changes, of sections 587, 593, 594, 595, 598, 601, 602 and 603 of the Penal Code of Texas.

''No separate and distinct offense was intended to be created by the mere enumeration of aggravating circumstances in section 6 of the Act of March 10, 1904, defining and punishing assault and assault and battery, or by the provision in section 8 for the imposition of a heavier penalty by reason thereof. Section 6 refers to assault as well as to assault and battery, for the history, context and plainly expressed purpose of the Act show that in providing that 'assault and battery' shall be considered aggravated when attended by the circumstances enumerated therein, the Legislature intended to say 'assault or battery'; which interpretation is in complete harmony with the spirit and text of section 3 and subdivision 14 of section 559 of the Penal Code, and does no great violence to the true principle of strict construction as understood and applied by the best modern authorities, who 'recognize only one rule as absolutely invariable namely, to seek out and enforce the actual meaning and will of the law-making power.' ''

The second assignment to the effect that the testimony of Aureliano Martínez should not have been admitted to contradict that of government witness José Lago is what has caused much discussion among the members of the court. In order to form an idea of the real question raised in and decided by the district court it is necessary to narrate all of the facts as they occurred.

We have said that the case was initiated by a complaint made in a municipal court. The case having been appealed to the district court, the district attorney intervened in the trial *de novo* in representation of The People.

The first witness called to testify was policeman Aureliano Martínez. He said that he was on duty at the place referred to in the complaint and at about 2 o'clock a. m. he heard two shots, ran and found a crowd in front of the club; that on the information received he entered the club, seized a revolver which was on a chair and arrested the defendant.

Immediately the district attorney called as a witness the person who appeared in the complaint as the one who had been assaulted, José Lugo, or Lago, as said in the complaint.

He testified that he had heard the two shots; that he did not know who fired them; that he left the place and saw the defendant about half an hour later when "I returned and saw a crowd near the club and then saw policeman Martínez with that gentleman," referring to the defendant. The district attorney questioned him and he answered as follows:

"Q.—Where were those two shots fired from? A.—I do not know. Q.—Nor did you see who fired them? A.—No, sir. Q.— Did you testify in the municipal court? A.—Yes, sir. Q.—Was your testimony the same as that given here? A.—Yes, sir. Q.— Are you sure? A.—Yes, sir."

The district attorney then moved the court that an investigation be made about the testimony of the witness in the municipal court, summoning the municipal judge "for whatever day may be set." The judge said: "If he has said something different there which we do not know." The district attorney answered: "That is why I requested the investigation. If we knew it we would have ordered the arrest of the witness." The attorney for the defendant said: "I object; you may do that after the trial, but that seems to be done only in order to make an impression." The district attorney replied: "I am not trying to impress the judge." The attorney for the defendant said: "I know that the judge

can not be impressed by anybody. I am quite sure of him."
The district attorney finally said: "Nothing more." The
attorney for the defendant: "Nothing."

Then the district attorney called witness Ramón Quiñones
who answered the district attorney's questions as follows:

". . . . I saw Confesor Méndez leaving the club and saying
'where is José Lago, that son of a bitch, I am going to murder
him,' and went on and walked about twelve meters past the door
of the club and turned back and then after standing five minutes
at the door José Lago was coming up from Stop 16 towards the
club and at that moment Bernardino González appeared and when
José Lago was near Confesor he stopped to talk to him, but I was
in front of the railing of the residence of the Pons family and
could not hear what he was telling him, when Confesor came, ap-
proached one of them and fired twice at him. Q.—Who fired the
two shots? A.—That gentleman (pointing to the defendant.) Q.—
With what? A.—With a Colts revolver. Q.—At whom? A.—At
José Lago."

Cross-examined by the defense, he repeated what he had
said. Questioned by the judge; he answered:

"Q.—What happened then after the shots were fired? A.—Then
the man fled, shouting 'police, police.' Q.—Who said 'police'? A.—
José Lago, 'that man is going to kill me, he is going to kill me,'
and two minutes later the policeman approached and I told him
'the man who fired the shots is upstairs.' He went up and came
down with him."

When the testimony of Quiñones was concluded the dis-
trict attorney called policeman Martínez and asked him if he
had heard the testimony of José Lago in the municipal court
to which he answered affirmatively and when he began by
saying "He testified . . . ." the following occurred:

"Attorney.—I object to the testimony of the witness on those
matters. Is the prosecution trying to impeach its own witness?
D. Attorney.— Yes. Attorney.— That will be for a prosecution
against him. Moreover, this man did nothing but hear the testi-
mony of witnesses at a trial and now comes before the court relying
on his memory as to the testimony of José Lago in the municipal
court. D. Attorney.—That might affect the credibility to be given

to it by the court. Attorney.—Your Honor is aware of the custom in all courts that after a witness testifies he leaves the court room and I am very much surprised that this witness should have heard the testimony of the witnesses who followed, since it is a rule the compliance with which is demanded by all attorneys for the defense. D. Attorney.—In the first place I must say that this witness is the first whose name appears on the complaint, and after witnesses testify they remain in the court; but in the second place that would be a question affecting the credibility of the witness, that does not render him incompetent to testify, because according to the law of evidence the incompetency of a witness depends on his credibility. It is incumbent on the other party to argue whether or not he tells the truth. Judge.—The testimony is admitted. Attorney.—Exception taken. D. Attorney.—What was the testimony of José Lago in the municipal court? A.—He stated in the municipal court that that night while talking with that colored man Confesor came from upstairs and fired two shots at him. Q.—Who stated that? A.—José Lago. Q.—That same witness who testified here? A.—Yes, sir. D. Attorney.—I move the court to summon municipal judge Aybar. Judge.—Motion granted. D. Attorney.—I give notice that I am going to present a motion to Your Honor to proceed, after hearing the testimony of the municipal judge, against witness José Lago for contempt for perjury.''

The testimony of the judge, if he was summoned and testified, does not appear in the record.

The defense cross-questioned the witness at length.

The last witness for the prosecution was Pedro Gorbea who testified in part as follows:

''A.—I noticed first a crowd outside there; I got near and someone says 'there comes the Spaniard.' I looked and indeed I saw that fellow known as the Spaniard, José Lago, who was coming hurriedly and was met by Bernardino González who arrived, and both engaged in conversation and I then heard a shot and saw Confesor Méndez in the attitude of having fired and still firing. I can not say that it was he who fired, but I saw the flash which came from the group where he was. It was a little dark and I can not say whether he had a revolver, but I can say that the flash was nearer the group where he was than the other two individuals.''

The evidence of the defendant consisted of the testimony

of Eustaquio Ortiz, Bernardino González, Eugenio Márquez. and Eugenio Larroca.

The first testified that he was at the place, heard the shots,. saw the crowd, saw the defendant and saw José Lago running past him. The second gave similar testimony.

The third, Eugenio Márquez, said:

"A.—We were standing at Stop 16 in Amigos del Oeste Club. upstairs in the hall when we heard two shots; we looked down and I saw José Lago coming upstairs. That is all I know. Q.— Did you see Confesor Méndez there? A.—Yes, sir. He was in conversation with us.. Q.—After that what happened, after the two shots? A.—After Lago came upstairs policeman Martínez. arrived, entered the club and said to Confesor: 'Give me that revolver with which they say you fired two shots,' to which he replied: 'I have none' and he said: 'Let me search you,' and he searched him but found nothing; then he looked around and saw a revolver on a chair and took it. Q.—That is all. D. Attorney.— Are you a brother of the defendant? A.—Yes, sir. Q.—Do you. not know who fired? A.—No, sir."

Eugenio Larroca testified:

"A.—That day I was going up Monserrate street, the other corner where the event took place and while there waiting for a. jitney going to Sunoco, I was then living there, I heard two reports and moved towards the place and then Lago was running towards. where I was and got there; shortly after that the policeman came, went into the club and came out with this man."

From the statement of the facts it is observed that the incident covers two periods. We do not think that it could be maintained that there was error in the first. The district attorney limited himself to asking for an investigation for the purpose of determining whether or not witness Lago had committed contempt by perjury.

Witness Quiñones testified and then was developed the second part of the incident in the manner stated.

The rule is that the party who calls a witness is not allowed to impeach his veracity by proving that he has a bad. reputation,. but by express provision of section 243 of the;

Code of Criminal Procedure he may "contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony."

And that is as it should be. Before calling a person to testify the party should ascertain his reputation. He has ample opportunity to do so and can not complain if he fails to investigate. But notwithstanding the most scrupulous investigation it may result at the trial that the witness says something which may be really prejudicial to the party who called him and contrary to what was expected of him. And the party should not be left without defense. This is why the law allows him to be contradicted in the manner indicated, that is, by contrary evidence or by showing that on previous occasions his testimony was inconsistent with his present testimony.

Jurisprudence has been very zealous that that right which is recognized by the law should not overstep the real limits and we entirely agree with the jurisprudence which establishes "that the mere failure of a witness to give favorable testimony for the party producing him does not entitle such party to prove that he has elsewhere made contrary statements which, if sworn to at the trial, would tend to make out a case" (27 Cal. Jur. 173), but that is not the situation here.

Here the testimony of Lago given before the court was prejudicial to the party who produced him as a witness. It was not a case of a simple negative. Lago was the victim. The complaint charged that the defendant had fired at him. Quiñones testified that he heard Lago say while running, "that man will kill me." In order to strengthen the testimony of Quiñones which entirely supported the complaint the district attorney thought it of advantage to contradict that of Lago. The denial of Lago involved a statement prejudicial to the case of The People and if the district attorney could show that Lago had made not only mere statements, but had made a sworn statement contrary to his present testimony, he was entitled to be given an opportunity for present-

ing it, not for proving his case, but for contradicting thereby the actual testimony of the witness.

Section 245 of the Code of Criminal Procedure reads as follows:

"A witness may also be impeached by evidence that he has made at other times statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of time, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them."

It is true that the district attorney did not adjust his action strictly to the procedure prescribed by the section cited. The district attorney started correctly. We know that he asked the witness whether he had testified in the municipal court and on receiving an affirmative answer asked whether he had testified the same there. The witness answered affirmatively and the district attorney repeated: "Are you sure?" and the witness answered: "Yes, sir."

At that time the district attorney knew nothing, according to his own statements. Perhaps he knew nothing also when he called policeman Martínez to testify for the second time after Quiñones had testified, but the fact is that he had an opportunity to inform himself and then call Lago again and so comply with the rule by giving him an opportunity to explain the contradiction.

But although failure to comply strictly with the rule is error, we do not think that it should be considered prejudicial under all of the other circumstances of the case and the emphatic and repeated statement of Lago that he had testified the same in the municipal court when, as testified by Martínez, it was fundamentally different. Moreover, no specific objection was made to the manner of introducing the evidence and this of itself would be sufficient for not considering this second part of the assignment.

Finally, it must not be forgotten that the case was not tried before a jury, but before the court which knew the law and the jurisprudence and therefore it should not be presumed that the court gave to the testimony of the policeman in relation to the testimony of Lago in the municipal court an importance at variance with the law and the jurisprudence.

As regards the third and last assignment of error, namely, that the judgment is contrary to the law and the evidence, it would be sufficient in order to hold that there is no error to remember our conclusion as to the first assignment and to refer to the testimony of Quiñones which of itself, as it was believed, may serve as a basis for the judgment of conviction.

The judgment appealed from must be affirmed.

Mr. Justice Wolf dissented.

### DISSENTING OPINION OF MR. JUSTICE WOLF

The majority opinion, citing from 27 Cal. Jur. 173, lays down the rule, that the mere failure of a witness to give favorable testimony, as expected, does not subject him to contradiction by previous declarations. Then, however, the conclusion of the majority is that such is not the situation before us and that the testimony was prejudicial to the government; that this is not the case of a simple negative.

In the first place, it does not seem to me that the mere statement of the existing rule does not give a perfect reflection of the state of the law. The rule was for a long time that, while a party might show his witness to be mistaken, he could not attack his veracity. A history of the rule was ably discussed in *Crago* v. *State*, 202 Pac. 1099. Section 243 of the Code of Criminal Procedure is remedial and allows contradiction and hence impeachment in certain specified cases. Outside of these exceptions the better authority is that a party producing a witness is estopped from impeaching him. It still is the law that before a witness may be contradicted he must have said something that is prejudicial; that tends by itself to hurt the case of the party producing

him. It stands to reason that under the rule before a party may be contradicted he must have given hurtful testimony.

The authorities show that when a witness denies positively the existence of a certain fact it may be shown that previously he asserted the existence of such a fact. Then his testimony is not a mere failure to testify, but the assertion of the non-existence of a certain fact.

If Lago had said that no shots were fired he might have been contradicted to show that he had said shots had actually been fired.

If Lago had said that Confesor Méndez fired no shots he might have been contradicted to show that he had made the contrary assertion. All that Lago said on the witness stand in this respect was that he did not see Confesor Méndez fire the shots. To contradict this testimony the government should have shown that Lago had made statements tending to show that he had in fact seen the shots fired by Méndez, in other words, to break down his denial of a special positive fact. The nearest approach to this was his calling out: "That man is killing me." There was no inconsistency introduced. In the municipal court it is quite within the range of possibility that Lago said that Confesor Méndez had shot at the said prosecuting witness, but had to admit on cross-examination that he had not seen the shots fired and could not testify positively who had fired them.

The government might have elicited the exact truth from Lago by an examination. This it failed to do. I am agreed with the majority opinion that the defendant waived the error of the government in not laying a proper foundation to contradict the witness, but I am insisting that the offered testimony did not tend to contradict Lago, and that the government failed to embrace the opportunity to get at the real truth.

I find nothing in the record to bring the facts within any exception to the rule of estoppel suggested. The effect of the introduction was to bring before the court hearsay tes-

timony properly objected to and the testimony was plainly prejudicial. Otherwise, why the strenuous insistence of the *fiscal* on introducing it?